GILBERT L. SMITH ET UX. v. COVENANT MUTUAL BENEFIT ASSOCIATION, OF ILLINOIS.

Delivered June 12, 1897.

**1. Mutual Benefit Insurance—Membership Fee—"Advance Premium."**

Where a mutual benefit association made a fixed charge against all applicants for insurance, regardless of age, which it termed an "advance premium," and which carried the policy for a stipulated period, and subsequent assessments were rated according to the ages of the members, this "advance premium" is held to be in the nature of a membership fee, and not an advance payment of assessments to be made after the period referred to.

**2. Same—Forfeiture—Mortuary Calls.**

The forfeiture of a policy issued by a mutual benefit association, for nonpayment of a mortuary call, can not be avoided because the insured understood the words "advance premium," in a notice from the association informing him that an indebtedness due him by the association had been paid to the agent as the advance premium, to mean the mortuary calls, where it is clear from the contract that the words referred to the membership fee, which belonged to the agent.

**3. Order for Payment of Money—Countermand—Validity.**

An applicant for membership in a mutual benefit association can not, after the delivery of a certificate to him, effectually countermand an order drawn upon the association, which was indebted to him, in favor of the agent who took the application, to pay him the membership fee, to which he was entitled under his contract with the association, notwithstanding an agreement of the agent before the order was given him to remit the membership fee.

**4. Mutual Benefit Insurance—Forfeiture—Payment of Assessment.**

The forfeiture of a certificate in a mutual benefit association, for nonpayment of a mortuary call, can not be avoided upon the ground that an indebtedness due from the association to the member should have been applied to such call, where the member accepted the certificate without objection, knowing that the association had applied such debt to the payment of the membership fee, to which defendant's agent was entitled under his contract with it, although the agent had in fact agreed with the member to remit the membership fee.

Vol. XVI. Civil — 38

**5. Charge of Court—Harmless Error.**

Appellant can not complain of the submission of an issue to the jury, where he invited the court to charge upon such issue.'

**6. Interpretation of Letter—Question for Jury.**

The question as to whether the writer of a letter intended it to countermand an order previously drawn upon the addressee is for the jury, to be determined by reference to the attending facts and circumstances, where it does not in express terms countermand the order.

**7. Charge of Court—Harmless Error.**

An instruction that the contract between defendants and a mutual benefit association was contained in the certificate and written application therefor, whereas the association's rules and by-laws were part of the contract, is not prejudicial error, where the court fully and correctly stated the legal effect of the contract to the jury.

**8. Mutual Benefit Insurance—Construction of Policy.**

The phrase, "or shall violate any agreement of this certificate," in a general provision of a certificate of insurance issued by a mutual benefit association, enumerating the cases in which notice to a member is a condition precedent to the cancellation of the certificate, will be construed to refer to agreements of the nature and kind particularly enumerated in the preceding part of the provision, and not to include the nonpayment of mortuary calls, which under another provision works an absolute forfeiture of the certificate.

**9. Same—Application of Assessments.**

A mutual benefit association may adopt a course of business by which death claims are paid out of funds raised by previous assesssments under mortuary calls, and replenish the funds thus depleted by the next mortuary call.

**10. Same—Amount of Mortuary Call.**

A member in a mutual benefit association can not complain that a mortuary call covers death claims that should have been included in the preceding call, where the call in question does not exceed the amount which he has contracted to pay, and is made for the purpose of replenishing the mortuary fund.

**11. Same—Unequal Assessments Against Different Members.**

A member of a mutual benefit assosciation can not complain that old certificate holders, whose certificates were issued under different by-laws and under different rates are charged less for their insurance than himself.

**12. Same—Notice of Assessment—Statutory Requirements.**

See notice of assessment held to be a sufficient compliance with the statute of Illinois under which it was issued.

APPEAL from Fannin. Tried below before Hon. E. D. McCLELLAN.

*Taylor, Galloway & McGrady* and *Pruitt & Smith*, for appellants.

1. If the payment of the order was countermanded by deceased before defendant became liable thereon, then defendant had no right to pay the money to Carden without deceased's consent, or unless deceased, knowing that the same had been so paid, ratified it. Harris County v. Campbell, 68 Texas, 28; 1 Morse on Banking, sec. 398; McGeers v. San Jose, 68 Cal., 91.

2. Where, by the terms of the policy, under one clause he may be heard on the question of forfeiting his policy, it can not be forfeited without such a hearing, although by a rigid construction a forfeiture might be had without a hearing. Scheufler v. Grand Lodge, 47 N. W. Rep., 799.

3. Call No. 120 was void as to deceased, because it was based upon a large number of claims that should have been included in the call issued on March 1st, preceding. Aid Society v. Holburn, 2 S. W. Rep., 495;

Bates v. Association, 51 Mich., 587; Underwood v. Legion of Honor, 66 Iowa, 134; Association v. Birnbaum, 116 Pa. St., 565; Association v. Spies, 114 Ill., 463; Ins. Co. v. Foote, 79 Ill., 362; Woodfin v. Ashville, 6 Jones L. (N. C.), 568.

4. The levying of an assessment of $9 against Dr. Smith, when other members holding policies the same as his, difference in age being considered, were assessed in the same call at a lower rate, was such a discrimination against him as would render the call a nullity. Swing v. Lumber Co., 64 N. W. Rep., 97; Aid Society v. Helburn, 85 Ky., 1; 2 S. W. Rep., 495; Tel. Co. v. Burnham, 47 N. W. Rep., 373; Bowen v. Kuehn, 47 N. W. Rep., 374; Ins. Co. v. Hayward, 69 Mass., 208; Ins. Co. v. Arthur, 73 Mass., 267; Ins. Co. v. Hartshorne, 90 Pa. St., 470; Pike v. Railway, 68 Maine, 445; Herkimer v. Fuller, 14 Barb., 373; 2 Thomp. on Corp., sec. 1724; Mora. on Corp., secs. 154, 302, 305; Cook on Stock and Stockh., sec. 114.

5. The notice of mortuary call No. 120 sent to Dr. Smith, not containing a statement of the object or objects for which the money to be collected was intended, was a nullity. Miner v. Association, 63 Mich.. 338; Griesemer v. Ins. Co., 38 Pac. Rep., 1031; Hannum v. Waddell, 36 S. W. Rep., 616; 2 Bacon Ben. Soc., sec. 380; Siebert v. Chosen Friends,. 23 Mo. App., 268; Baker v. Ins. Co., 16 N. W. Rep., 391; Bates v. Association, 17 N. W. Rep., 67; Cooke on Life Ins., p. 162, note; Mulroy v. Supreme Lodge, 28 Mo. App., 463; Payne v. Rochester Soc., 6 N. Y. St. Rep., 365; Mut. Endowment, etc., v. Essender, 59 Md., 468.

*W. C. Calkins* and *Harris, Etheridge & Knight,* for appellee.—1. If it was agreed that the $37.50 should be applied on the advance premium, Dr. Smith could not countermand or refuse payment of this sum and at the same time retain the policy of insurance, the validity of the policy depending upon the payment of the premium. By claiming a benefit under the policy, he became bound to pay the consideration. Roberson v. Town, 76 Texas, 535; 2 Rice on Ev., sec. 308; McQuery v. Guillilan, 7 L. R. A., 454, and note; Bige. on Estop., 683.

2. The court did not err in submitting to the jury the question whether or not the letter of Dr. Smith to defendant of December 11, 1892, was a countermand of the order to George A. Carden, for its construction depended upon the intent to be gathered from all the facts and circumstances. Taylor v. McNutt, 58 Texas, 75; Moss v. Helsey, 60 Texas, 438; Talliaferro v. Cundiff, 33 Texas, 416; 28 Am. and Eng. Encyc. of Law, p. 535.

3. If the appellee in good faith applied the $37.50 belonging to Dr. Smith on his advance premium, and so notified him, and he acquiesced in. such application, he could not after his policy was forfeited for the non-payment of a mortuary call subsequently levied, repudiate this application and insist upon the application of said money to the said call, so as to impose a liability upon appellee for more than $5000, in favor of beneficiaries of his policy, but if this was error, it was invited by appellant's third

requested charge, and they can not complain. 2 Pom. Eq. Jur., 817; Bige. on Estop., 683; Hansen v. Sup. Lodge, 29 N. E. Rep., 1121; Eaton v. Sup. Lodge, 22 Cen. Law Jour., 560; Hopkins v. Phoenix, 43 N. W. Rep., 197; 78 Iowa, 344; Ins. Co. v. Hogarty, 36 N. Y. Supp., 558-562; 2 Whart. on Ev., secs. 1140, 1154; 1 Greenl., sec. 197, et seq.; 62 Am. Dec., 91, note.

4. The general language of section 14 of the printed conditions on the back of the certificate, "or shall violate any of the conditions of the agreement of this certificate," must be construed so as to refer to conditions and agreements of the nature and kind previously particularly enumerated, and should not be extended to conditions relating to forfeiture for nonpayment of bi-monthly calls, for which special provision is made in section 2 of said printed conditions. The particular controls the general. Railway v. Rambolt, 67 Texas, 656; Perez v. Perez, 59 Texas, 322-324.

5. Valid assessments may be levied even where the death claims have already been paid, provided the object is to replenish a fund from which the association has temporarily borrowed the money with which to make prompt payment of the claim, or when the association is entitled to maintain a reserve to meet future obligations. Niblack, p. 481; McGowan v. Sup. Council, 28 N. Y. Supp., 177; Wolf v. Mich., 66 N. W. Rep., 576; Ins. Co. v. Brumbaum, 116 Pa. St., 565; 3 Am. and Eng. Encyc. of Law, p. 1093, et seq.

6. Call No. 120 did not require of Dr. Smith a greater sum than was due according to his contract, and was no discrimination against him in favor of those who became members before March, 1890, the difference in rates being justified and explained by the difference in the contracts made with those who became members before March, 1890, and those who became members afterwards. Niblack, pp. 273, 475; Hall v. Ins. Co., 31 Atl. Rep., 1066; Cohen v. Ins. Co., 63 N. W. Rep., 304; Leffingwell v. Ins. Co., 53 N. W. Rep., 243; Weiler v. Equitable, 36 N. Y., 734.

FINLEY, ASSOCIATE JUSTICE.—This is a suit brought by Gilbert L. Smith and wife, Malinda F. Smith, against the Covenant Mutual Benefit Association of Illinois, based upon a certificate of insurance for $5000 issued by the defendant to Dr. Tolbert C. Smith, payable upon his death to his mother, Malinda F. Smith. The defense to the action relied upon by the defendant was a failure to pay a mortuary call or assessment, whereby the certificate of insurance lapsed and became forfeited, under the provisions of the contract of insurance. The case was tried by a jury, and resulted in a verdict and judgment in favor of the defendant. From this judgment an appeal has been perfected to this court by plaintiffs.

The issuance of the certificate of insurance, the death of the assured, and that plaintiff Malinda F. Smith is the beneficiary, are all unquestioned facts. The only question to be determined by the trial upon which there was a contest was whether the certificate had lapsed and become void by reason of a failure to pay a mortuary call or assessment. Upon this issue arose several minor issues of fact, and quite a number of questions of law.

The defendant, as indicated by its name, is a mutual benefit association. Its certificate holders are its members. It has a constitution, by-laws, rules, and regulations for its government, and it pays its liabilities, created by death of persons holding its certificates of insurance, through assessments or mortuary calls upon its members. Only one assessment was levied against deceased's policy, and that was call 120.

The certificate consists of a printed form furnished by defendant, filled out as is usual in insurance policies. The essential parts of the certificate are as follows:

"In consideration of the receipt of the advance premium, the payment of all bi-monthly premiums hereafter required, and the representations, agreements, and warranties made in the application for membership, * * * a copy of which is hereto annexed, and the agreement upon his (deceased's) part to accept and comply with all the provisions hereinafter stated, the Covenant Mutual Benefit Association of Illinois does hereby issue this policy and constitute the above named applicant (deceased), hereinafter termed the insured, a member of the said association, and agrees to pay from any funds received or to be collected for mortuary purposes as a benefit to his mother Malinda F. Smith, * * * within ninety days from the receipt by said association of full and satisfactory proofs of a valid claim under this contract, conditioned upon the death of the insured, the sum of five thousand dollars, together with such part of the emergency fund as shall be due under the terms of the contract, any unpaid premiums or other indebtedness being first deducted therefrom. Provided further, that in the event the insured shall become totally and permanently disabled, * * * upon the determination of the medical director and executive board, this policy, if then in force, may, at the option of said executive board, be surrendered properly receipted at one-half its face value. * * * Provided especially, that this policy of insurance and the provisions, requirements, conditions, agreements, representations, and warranties set forth in the succeeding pages (of said policy) or contained in the said application (for said policy) shall be taken together, and in such entirely shall constitute the contract of insurance between the association and the insured. And this certificate or policy of insurance is issued solely upon the statements, representations, and warranties made in the aforesaid application, and shall not go into effect or remain in force or be binding upon the association unless such statements, representations, and warranties are true, and the insured shall fully comply with all the conditions, requirements, and agreements contained in this contract.

"In witness whereof, the said Covenant Mutual Benefit Association of Illinois has this 19th day of December, 1892, by its president and secretary, signed, sealed and delivered this contract, at its office in the city of Galesburg, Illinois.

(Seal.)  "A. W. BERGGREN, President.
(Signed)  "W. H. SMOLLINGER, Secretary."

The following conditions, among others, appear on the back of the certificate, the others being immaterial on this appeal:

"1.    To provide for the payment of all death claims, or other current expenses, and to maintain an adequate emergency or reserve fund to guarantee the prompt payment in full of all future obligations there shall be due, according to the mortality experience and emergency fund requirements of the association, and payable at its general office in Galesburg, Ill., on the first business days of January, March, May, July, September, and November, respectively, of each and every year during the continuance of this contract, a bi-monthly premium or assessment based upon the annexed table of rates, according to age, and graded acording to the mortality experience of the association, and amount of benefits named herein; provided, however, that at such time or times as the insured shall be entitled to the advantages of the emergency fund, as hereinafter stated, the board of managing directors may readjust the grading or basis of the bi-monthly assessments or premiums due thereafter in accordance with the amount of such emergency fund then available, the current age of the members, and the mortality of the association.

"2.    No personal liability of the insured is incurred by becoming a policy holder in this association; but this certificate of insurance is issued and accepted subject to the express conditions that if any of the payments stipulated in this contract shall not be paid to the association on or before the day of the date as provided in this contract, at its home office in Galesburg, Ill., this contract shall terminate, and all rights be forfeited to the association.

"3.    The amount received from bi-monthly premiums or calls less the amount hereinafter provided for the general and emergency funds, shall constitute the mortuary fund, and shall only be used for the payment of death claims and the protection of the mortuary fund.

"4.    Twenty-five cents on each five hundred dollars of insurance, to be collected bi-monthly (which is included in the above [following] table of rates) shall be carried to the general fund to provide for the expenses.

"5.    Twenty per cent of the mortuary premium received under this certificate or policy of insurance may be converted into the emergency fund and held in trust, as provided in the by-laws, for the exclusive benefit of the policy holders, to be used only for the purpose of paying the actual increase of cost by reason of the advancing age of members and payment of death losses in excess of the actuary's mortality tables, as provided in section 6.

"6.    After the certificate or policy has been in force for six years from the first day of January following its date, and annually thereafter, there shall be an equitable distribution for use in paying future mortuary premiums, of so much of the then unappropriated emergency fund and its accumulations as are derivable from the constrisions made thereto the sixth respective preceding year and part of year; and upon the death of the insured, after this certificate or policy has been in continuous force

six years from the first day of January following its date, there shall be due the beneficiaries hereunder, payable in like manner and under same conditions as the benefits named herein, such part of the then total emergency fund and its interest accumulations as the association's actuary shall determine legally due, in proportion to the contributions made by the insured thereto.

"7. A printed notice, directed to the address of the insured as it appears at the time on the books of the association, and deposited in the postoffice, or printed in a newspaper published by the association, and forwarded as aforesaid, shall be legal notice of any required payment, and the testimony of the secretary, supported by the affidavit of the person or persons who performed such service of mailing said notice so addressed, shall be taken and admitted as conclusive evidence of such mailing, and as absolute proof of due notice to the insured.

"8. In case of change of residence, postoffice address, occupation, or name of the insured, he or she must immediately notify the secretary of such change, and upon the failure of the association to receive such notice, it shall proceed for all purposes as if no such change had been made.

"9. No liability shall be incurred by the association until the payment of the advance premium, the receipt and approval of a written application, and this certificate or policy of insurance has been issued and delivered during the life and good health of the insured; and no agent or other person, except the president or secretary, has power to change, modify, or alter this contract or to waive forfeiture, extend credit, or grant permits.

"11. If the insured shall personally engage in blasting, sub-marine operations, underground mining, selling intoxicating liquors, glass-blowing, manufacturing poisonous, explosive, or inflammable substances, trading or residing among savage tribes or nations, or be employed as an indoor stone or marble cutter, quartz mill operator, as a fireman, as a railroad switchman, engineer, fireman, brakeman, or freight conductor, or shall be engaged in military service (except in time of peace), or in naval or marine service without having first obtained the written consent of the association, or shall die in consequence of engaging in dueling, fighting, keeping unlawful or disreputable resorts, the violation or attempted violation of the laws of any nation, State or province, by the hands of justice, or be convicted of a felony, then in each and every such case this certificate or policy shall be null and void, and all payments made thereunder shall be forfeited.

"12. If the insured shall use stimulants or narcotics to such an extent as to impair his or her health, or produce delirium tremens, or cause death; or shall die while intoxicated, or from the effects of drunkenness; or if there has been any false or untrue statement made in the application or examiner's certificate, then, and in each and every such case, this certificate shall be null and void, and all payments made thereon shall be forfeited to the association.

"14. If at any time during the first five years of this contract, reliable

information and evidence shall come to the knowledge of said association that the insured did make false and untrue statements in his or her application, on the good faith of which this certificate is issued, or if the insured shall be guilty of any criminal act, or shall injure his or her health by the use of alcoholic, narcotic, or other stimulants, or shall become an habitual or excessive user of intoxicants, have delirium tremens, or shall violate any one of the conditions or agreements contained in the application or this certificate, the association may, by written or printed notice signed by its president and secretary, notify the insured of his or her violation of the conditions and agreements therein contained, and that the question of the cancellation of the same will come before the board of managing directors at the time named in said notice (which shall not be less than thirty days from date thereof) for hearing and investigation, and the finding of said board, and their action thereon, shall be final and conclusive.

"15. This contract shall be governed by, subject to, and construed only according to the laws of the State of Illinois, the place of this contract.

"16. If this contract shall have been in continuous force until five years from its date, it shall thereafter be incontestable for error or misstatements in the application, and for all causes named in sections 12 and 14 of this contract, provided the conditions as to occupation and payment of mortuary calls have been complied with; and provided further, that where an under statement of age is made, in which case the benefits recoverable herein shall be such proportionable part only of the whole benefit named herein as to the total amount of the mortuary premiums paid bears to the total amount required at the true age, and except, further, that if the true age at the date of the application was beyond the limit of age then taken by the association, then there shall be recoverable only the total amount of bi-monthly premiums paid thereon."

On the back of the policy is a table of rates showing rate per $1000 insurance, bi-monthly, at the ages given—the age at joining—running from 21 up to 60:

| Age. | Amt. | Age. | Amt. | Age. | Amt. | Age. | Amt. |
|------|------|------|------|------|------|------|------|
| 21 | $1 78 | 25 | $1 85 | 29 | $1 97 | 33 | $2 10 |
| 22 | 1 80 | 26 | 1 88 | 30 | 2 01 | 34 | 2 15 |
| 23 | 1 82 | 27 | 1 91 | 31 | 2 04 | 35 | 2 18 |
| 24 | 1 83 | 28 | 1 94 | 32 | 2 07 | 36 | 2 22 |

The application made by deceased for the policy contained the questions usually found in printed applications for life insurance, and also contained the further printed provisions:

"Advance payment must in all cases accompany the application."

"I, the undersigned applicant, do hereby declare that I have made full and correct answers to all questions in forms A and B, and whether said

answers, together with the foregoing explanations, are in my own handwriting or not, I adopt them as my own, admit them to be material, and warrant them to be full, complete, and true in all respects, and further agree, that said answers and this declaration shall form the exclusive and only basis of the contract between myself and the Covenant Mutual Benefit Association; said contract not to be in force or binding upon the association until after the payment of the advance premium and the approval of the application by the medical board, during my life and good health, which contract, when completed by the granting of a policy, shall be subject only to the conditions and stipulations contained in said policy and this application, which are hereby accepted and made the complete terms of the contract, and for myself and my beneficiaries I hereby authorize any physician possessing knowledge or information, acquired professionally or otherwise, touching matters herein referred to, or any disease I may hereafter have, to disclose the same fully at the instance of said association. * * * And I further agree, that if any fraudulent or untrue answers have been made, and if death shall result from suicide before five years' continuous membership, and if I shall use intoxicants, opium, or other stimulants to an extent liable to injure my health or shorten my life, or shall omit, neglect, or refuse to pay any of the mortuary calls on or before the day on which they shall fall due, then, and in either event, this contract shall be null and void, whether so declared by the association or not, and all moneys which have been paid shall be forfeited to said association."

Said application has printed upon its back the following:

"All applications must be mailed so as to reach the principal office within one week from date of examination. No application will be acted upon, or policy issued thereon, until it has been fully completed in accordance with the rules of the association and instructions herein contained. W. H. Smollinger, Sec'y."

Also the following:

"This blank to be used only by medical director. Medical Director's Memoranda. A. D. Wing.

"Approved Dec. 19, 1892."

This application has stamped upon it: "Rec'd Dec. 16, 1892."

The application was received at the home office of defendant December 16, 1892.

At the time of the issuance of the certificate the appellee had in force certain by-laws, the beginning of which read as follows:

"Constitution and By-Laws and Rules and Regulations of the Covenant Mutual Benefit Association of Illinois. Principal office, Galesburg, Ill. Incorporated January 9, 1877. Revised 1892."

The following portions are presented as pertinent in the consideration of this case:

"Article II, section 1, By-Laws: That the object of the association shall be to furnish financial aid to the heirs, devisees, etc., of deceased members or to totally disabled members."

"Article 6, section 1, By-Laws, provides that all moneys received by the association shall be placed in one of the following funds: Mortuary, reserve-emergency, advance, or general fund, such funds to be held in trust for the membership as provided in the by-laws."

"Article IV, section 1, Rules and Regulations, provides that 'neither of the several funds, or any part of them, shall be divided among the officers or members of the association as profits or otherwise except to equitably distribute any surplus belonging to the reserve funds as provided in section 3 of this article, which has served the purposes for which it was collected and is no longer required for the proper maintenance of that fund, or in the event of a final dissolution of the association.' "

Section 2 provides, that "all moneys realized or received by the association from assessments or bi-monthly calls, made and collected for mortuary or total disability purposes, shall belong to and be placed in the mortuary fund, and no part or portion of this fund shall be used in any manner or appropriated for any purpose other than the payment of death and total disability claim, and the protection of the mortuary fund; except that the managing directors may set aside and transfer to the reserve emergency fund 20 per cent, or less, of the total amount collected from time to time for mortuary and total disability purposes, which amount when so set aside and transferred shall be appropriated and used only as provided in section 3 of this article."

Section 3: "To provide for the purposes hereinafter stated, and when. so ordered by the managing directors, 20 per cent, or less, of the total amount collected from time to time for mortuary and total disability purposes may be placed in the reserve-emergency fund, securely invested as provided in section 6 of this article, and held in trust for the exclusive benefit of members of this association, to be used only for the following purposes, viz: First, for the payment of death losses or total disability claims that may occur in any one year in excess of the rate stated in the actuaries' tables of mortality. Second, to provide for and pay the actual increase of cost by reason of the advancing age of members. Third, annually after January 1, 1897, provided in the judgment of the management it can be safely done, to equitably distribute, for use in paying mortuary premiums, and unappropriated surplus derivable from the contributions made thereto during the sixth respective preceding year. Fourth, on the death of a member who shall have contributed to the reserve-emergency fund for six years, to return to his benefit the unused or unappropriated portion of such reserve-emergency fund, which may have been contributed by said deceased member in his lifetime."

Section 4: "All moneys realized from membership fees, monthly or annual dues, expense premiums or assessments, or received by the association from any other source, and not properly belonging to either the mortuary, reserve-emergency, or advance funds, shall be placed in a separate fund to be known as the general fund, and each member shall pay $12\frac{1}{2}$ cents per month on each $500 insurance carried, which shall be collected with each bi-monthly call. All agency and general expenses

of the association shall be paid from this fund, and when it shall be in excess of the current and emergency requirements of the association, the managing directors may transfer such excess into the mortuary fund."

Sec. 5: "All moneys received by the association as advance premiums, or deposited with it to provide for the payment of future bi-monthly calls or assessments, shall be placed in the advance fund, and shall be withdrawn from it and used only when necessary to meet the payments for which they are deposited, except that upon the death of the insured for whose benefit the advance of deposit was made any unused portion thereof shall be withdrawn and paid with the certificate at its maturity in addition thereto."

Article V, section 2, Rules and Regulations: "An advance premium of $8 per $1000 insurance must be collected with each application for membership, and on applications for a less amount than $1000 the advance premium shall be $8.

The assessment rates of the association shall be based upon the following tables for each $1000 indemnity, and shall be such percentage thereof as the mortality experience of the association shall require."

Then follows the table, which is same as on back of the policy and given herein. The rates given in the table provide for the accumulation of the mortuary, reserve-emergency, and general funds.

Article V, section 3, Rules and Regulations: "In case the insured shall become totally and permanently disabled, the executive board, upon the recommendation of the medical director, may, if all the conditions of the contract have been complied with, upon the surrender and cancellation of the policy, pay one-half its face value in cash."

Section 7: "For the purpose of preventing unintentional lapsing and for the accommodation of members, the managing directors shall, from time to time, in accordance with the mortality experience, adopt rules of advance deposit, which shall render certificates nonforfeiting for the nonpayment of assessments for the time agreed upon, not exceeding one year.

"The secretary shall at all times accept advance deposits from members, which shall be placed to their credit, and stand chargeable with any assessment that may be due as they occur, and the notice of such assessment shall bear on its face a memorandum of the credit balance due such member after deducting the amount of such assessment."

Section 10: "The managing directors shall order six regular mortuary calls each year, on which all members having held membership for at least 105 days prior to the date thereof shall be liable. They shall be issued on the first business day of January, March, May, July, September, and November, respectively, and shall close thirty days from date, but the managing directors may at their discretion by affixing a penalty of not less than 10 cents, extend the time to all who can not pay within the thirty days.

"The mortuary calls shall be in such form and contain such facts as the laws of Illinois may require, shall state when it will close, and what extension of time, if any, is given."

Section 11 provides, that "any member may withdraw from the association by notifying the secretary, in writing, returning his or her certificate, and paying whatever may be due the association, but shall thereby forfeit all claims to the funds of the association, as well as any amount he or she may have contributed thereto."

The Illinois statute on the subject of notice was introduced by the appellee, and was as follows:

"Assessment Notices—Application of Fund.—Assessment notices sent to members by any association or corporation doing business in this State, shall state the object or objects for which the money to be collected is intended, the names, last address, and amount of certificate of deceased members, the amount to which the beneficiary of each is entitled or the amount which would be realized for the beneficiaries of each if all the members who are assessed would pay their assessments; and no part of the funds collected for the payment of death benefits shall be applied for any other purposes."

The assured was 22 years old when the certificate was issued to him, December 19, 1892, and his bi-monthly assessment under the contract was $9. The certificate was declared lapsed by the association on June 16, 1893, for the alleged nonpayment of call No. 120, for $9. The call bore date May 1, 1893, though it was ordered on the 4th day of April, 1893. The resolution of the board of managing directors by which it was ordered was: "That the following proofs of death having been reported complete and sufficient by the medical director, attorney, and actuary, and reviewed and approved by the executive, be approved and assessed upon as mortuary call No. 120. The call on all policies issued subsequent to March, 1890, to be the maximum given in the table of rates on the back of the policy." Then follows, as a part of the resolution, a list of seventy-two death claims, aggregating $193,500, with the name and residence of each deceased member. As a matter of fact, however, every one of these claims had been paid before the resolution was passed, out of funds on hand arising from previous assessments.

The following notice of assessment was mailed to the deceased on the 28th day of April, 1893, dated May 1, 1893:

"You are hereby notified that in consequence of death of members of the association whose names appear on the accompanying sheet, satisfactory proofs of death having been filed and approved, a call for $9 has been ordered in accordance with the conditions of your certificate, by the terms of which it is now due and must, under penalty of forfeiture, be received at this office on or before May 31st, or within thirty days from the date of this notice. Assm't closes May 31, 1893. Next call issued July 1, 1893. Mortuary call including ——cents. Expense $——. W. H. Smollinger, Secr'y."

The sheet which accompanied the notice contained the following clause: "The following death claims having been approved and paid, mortuary call No. 120, issued May 1, 1893, is ordered by the board of managing directors." Then follows a tabulated list of claims, giving the

number of each policy, amount of policy, amount paid to the association, what same amount of insurance would have cost in old line companies, what the amount paid on each to the association would have brought in old line companies, name and residence of the deceased, name of beneficiary, when proofs were completed, when the claims were each paid, and the amount paid to each.   Nothing else is stated in regard to the claims. The claims are the same as given in the resolution above.   Twelve of these claims, amounting to $21,375, are stated in this sheet to have been paid on February 15, 1893; three, amounting to $6000, on February 17; four, amounting to $13,500, on February 18; nine amounting to $25,750, on February 20; five, aggregating $17,250, on February 21; nine, aggregating $22,000, on February 24; one of $2500, on February 25; two, aggregating $7500, February 28.   The proofs of thirty-four of these claims were completed on January 10, 1893; 34 on February 13; two on February 28, 1893; one on March 21, 1893; and one, that of C. W. Breed, of Chicago, for $1000, on September 7, 1892.

It was conclusively shown, and not controverted, that said mortuary call No. 120 was not paid.   Appellants try to meet this issue, first, by showing that under the contract of insurance he was not subject to any charges or assessments until about six months after his certificate was issued, and that the company had funds belonging to him which it should have applied to the payment of this assessment; second, that the call was not legally binding upon him, for reasons which will be hereafter considered.

The evidence was conflicting upon the questions whether the assured was to be charged anything for the first six months after the issuance of the certificate, and whether the company held funds of the assured which it should have applied to payment of mortuary call No. 120.   The defendant's testimony tended to show, and was a sufficient predicate for the finding of the jury, that defendant's soliciting agents, Carden and Wilkerson, employed the assured as medical examiner for the company, agreeing that the company should pay him $2.50 for each person examined by him.

The assured agreed that he would invest half the sum realized by him from this source, upon the basis of $8 per thousand advance premium to be paid by him.   Under arrangement with the company, this advance premium went as compensation to the soliciting agents, and in addition, the general agent of the company, under whom they were employed, paid them a bonus of $1 per thousand insurance secured by them.   The soliciting agents were authorized to remit to the assured this advance premium whenever they desired so to do, and they took that course to a large extent, receiving as compensation only the $1 per thousand bonus offered by the general agent.

These agents procured at Honey Grove twenty-seven applications for insurance, outside of the application of Dr. Smith, and to each of them they remitted the advance premium of $8 per thousand which the policy and laws provided should be paid.   The assured, Dr. Tolbert C. Smith,

examined each of the applicants, and his agreed compensation amounted in the aggregate to $67.50. The payment of the advance premium carried the policy, under section 10 of the by-laws, heretofore quoted, for at least 105 days free of further charges. These bi-monthly mortuary calls were required to be made on the first business days of January, March, May, July, September, and November, and when the certificates were issued between November 16 and the 1st of January, the payment of the advance premium carried the insurance free of further charge for forty-five days in excess of the 105 days, 150 days, or about five months.

The policy in this case was issued December 19, 1892, and the advance premium therefore carried it 150 days; that is, it was not subject to mortuary call until May 1, 1893. The company paid the assured $30 by draft, on the amount due him for examination of applicants, and on his written order it paid the balance due him, $37.50, to its agent, George A. Carden. The evidence shows conclusively that, before the giving of this order upon the company for $37.50 to the agent Carden, a controversy arose between said agents and assured as to whether the assured should pay them anything. The assured contended that the advance premium was to be remitted to him by the agents, as had been done with the other applicants, while the agents contended that he was to pay them the advance premium. This controversy terminated in the giving of the order upon the company for $37.50 to the agent Carden, this sum being $2.50 less than the advance premium provided for by the laws of the company. After this the application of the assured was sent in to the home office of the company, and the certificate was issued to him.

The order given by deceased was as follows:

"HONEY GROVE, TEXAS, Dec. 3, 1892.
"Pay to the order of Geo. A. Carden $37.50, and charge to my account.
"To Covenant Mutual Benefit Association, Galesburg, Ill.
"T. C. SMITH, M. D."

The order has marked on it in pencil: "O. K. 12-28-92."

On the same day that this order was given, deceased wrote a letter to appellee in regard to it. Demand was made in open court upon appellee to produce this letter, but it failed to do so. It was admitted that notice to produce it was given in due time. Appellee's attorneys claim that the letter could not be found. Its contents are unknown, except as may be inferred from the reply to it introduced by appellants, which is as follows:

"OFFICE OF COV. MUT. BEN. ASS'N,
"GALESBURG, ILL., Dec. 9, 1892.
"T. C. Smith, M. D., Honey Grove, Texas:
"DEAR SIR.—I have your esteemed favor of December 3, and in reply to the same would say that I am certainly surprised at the facts recited in

your letter.   I wish that you would write me and advise me what the circumstances were under which you gave this order to Mr. Carden, and for what you were owing him?   Is it in payment of advance premium on an application which you expect to make, or what?   Certainly he is not entitled to any of the medical examination fee, and the only way that I can see in which he would have a right to ask you for an order for money that was due you on account of work done for this association would be if you were indebted to him.   Should be pleased to have you write me fully in relation to this matter.

"Very truly yours,<br>"W. H. SMOLLINGER, Sec'y."

This letter was replied to by deceased, as follows:

" HONEY GROVE, Dec. 11, 1892.

*"Mr. W. H. Smollinger, Galesburg, Ill:*

"DEAR SIR.—Your letter of 9th to hand.   Will say in reply that I was not under any indebtedness to Mr. Carden whatever.   I examined twenty-seven applicants and was to receive $2.50 each, but on settlement was forced to discount my account $37.50, or receive nothing, so I thought it better to take $30 than nothing, as Mr. Carden, after I had done the work, claimed that all collections came through him, and before he would send in my account I would have to give him an order for $37.50.   I thought it a strange way of doing business, is the reason I have written you.   From your letter I see Mr. Carden has done me a wrong, and if it is in the power of the association to have justice done me and pay me the full amount ($37.50) I would be under many obligations to you.   Mr. Carden has no right to extort this money from me, and I am willing to leave this matter with you gentlemen.   Please answer as soon as convenient, as I will leave for the Polyclinics at New York soon.

" Very respectfully,<br>"T. C. SMITH."

The letter has the following indorsements stamped thereon:

"Rec'd Dec. 14, 1892." "Dec. 21, 1892." "Answered Dec. 22, 1892. Cov. Mut. Ben. Ass'n." "Answered Dec. 15, 1892. Cov. Mut. Ben. Ass'n."

Appellants introduced the following reply to the foregoing letter:

"GALESBURG, ILL., Dec. 15, 1892.

*"Dr. T. C. Smith, M. D., Honey Grove, Texas:*

"DEAR SIR.—I have your esteemed favor of recent date, and in reply to same would say that I will take the matter referred to in your letter in hand, and will fully investigate the same.

"Very truly yours,<br>"W. H. SMOLLINGER, Sec'y."

Accompanying the policy was the following letter to deceased:

> " Office of the Cov. Mut. Ben. Ass'n,
> " Galesburg, Ill., Dec. 19, 1892.

*"T. C. Smith, Esq.:*

" Dear Sir.—With this please find your certificate of membership, No. 75142, for $5000, which upon examination we trust will be satisfactory. Please read the certificate, and copy of application attached, carefully, and should error be discovered notify us at once. You will expect to receive your first mortuary call for $9 from the first of next May. The same to be paid at this office within thirty days from its date. Fraternally yours,

> "W. H. Smollinger, Sec'y."

The next letter, sent out about December 28, was as follows:

> "Galesburg, Ill., Dec. 20, 1892.

*"Dr. T. C. Smith, Honey Grove, Texas:*

"Below find statement of your account from Nov. 15, 1892, to Dec. 15, 1892. Trusting that you will find everything correct and satisfactory, I am fraternally,

> "W. H. Smollinger, Sec'y.

| "1892. | Dr. | | 1892. | Cr. | |
|---|---|---|---|---|---|
| "Dec. 20—To advance premium | $37 50 | | Dec. 15—By examinations | $67 50 | |
| "Dec. 20—To cash draft No. 5124 | 30 00 | | | | |
| | $67 50 | | | $67 50 " | |

There was also an itemized list of examinations made by deceased in the statement.

On December 22d appellee wrote deceased, as follows:

> " Galesburg, Dec. 22, 1892.

*"T. C. Smith, Esq., Honey Grove, Texas:*

"Dear Sir.—With reference to the matter of $37.50, which you state you paid to Mr. Carden, under misrepresentation, under protest, etc., would say we have endeavored to make a thorough investigation of the same and are informed that you agreed to make application for a policy of $5000 insurance, on which the advance premium is $40, and that Mr. Carden rebated the advance premium of $2.50, and that you gave an order for the balance of $37.50. If there was such an arrangement he certainly was entitled to the money, and you should complete the application at once. Very truly yours,

> "W. H. Smollinger, Sec'y."

On December 6, 1893, deceased wrote appellee, asking when he would be required to make another payment on his policy, to which the appellee replied that the policy had lapsed through nonpayment of call No. 120; to which last letter deceased replied on December 30, 1893: "You are

undoubtedly mistaken when you say my policy has lapsed, for I have your written receipt for payment of advance premium for one year, and my policy bears date of December 19, 1892. If you will examine the matter closely you will find that a portion of my fees for making medical examinations for the company went to pay this advance premium. It has been my intention all the while to keep my policy in good standing." The letter inclosed $15, which was returned by appellee.

W. C. Calkins, appellee's general counsel, testified in its behalf as follows: "I am one of the directors of defendant. This call (120) was made on all of defendant's members, on those holding certificates dated prior to 1890, as well as on those dated subsequent thereto; but the call made on members whose certificates bore date prior to 1890 was made on a separate plan and according to the provisions of their respective contracts, but were all included in the call as mortuary call No. 120. What I mean by separate plan is a plan separate from the plan named in the policy involved in this suit, and described in the by-laws in force at the time the contracts were made. The call made as above stated on certificates dated prior to 1890 was made under defendant's original by-laws as revised January 26, 1886, and in 1888, and under the other by-laws preceding that. But the call was made at the same time under the same resolution as call 120, and made at the usual time, place, and in the usual and customary manner. Each policy holder is assessed according to the provisions of his contract and the by-laws in force at the time his contract was made. The calls prior to 1890 were upon policies that were, to use one expression, 'Kind o' pass-around-the-hat policies;' they contained no promise to pay money; they did contain a promise to pay whatever might be realized from the assessment, realized from membership, and from ready comparison show calls there and by-laws different from those as shown by these by-laws (revised by-laws, 1892). Those policies were made with reference to paying current death claims, death claims as they occurred without reference to the future; they contained no provision with reference to paying back dividends, or on total disability. The second class, which includes the policy in this suit, as a fact contains all those clauses, total disability, which means payment of half in case a man is totally disabled, and makes the premiums to declare dividends at the end of six years; also provides for protecting future obligations. We pay, and had for some time been paying, our claims in advance, paying them just as soon as they were presented to the company, borrowing from the fund then on hand, to be replaced by future assessment, and this assessment (No. 120) is one of them. This levy was made in the usual manner. The death claims contained in the notice of mortuary call No. 120 had been paid out of the mortuary fund, and said call was made to replenish that fund. The experience of the society is that the death rate of the old policy holders averages precisely the same as it does under the new, under the same conditions. And the excess col-

lected from the new policy goes to their credit under their contract in the way of dividends at the dividend period. Members whose policies antedate the year 1890 are paid in full, same as those coming in since 1890, and the increased rates charged to those whose policies are dated since 1890 are accounted for in the total disability clause, and other extra privileges under policy since 1890, and according to our idea the mortality experience makes them pay about the same rate. The same form of notice is used in the one class as is used in the other, except as to grade and number of particular policy and amount to be paid by that particular holder, which was governed by the contract and by-laws at the time it was insured."

Appellee introduced in evidence its various by-laws antedating the "Revised By-laws of 1892."

The by-laws of 1877 provided for the following maximum rates of assessments for each $625 of insurance, according to the age at joining, and the membership of the association:

| Ages. | Amt. | Ages. | Amt. | Ages. | Amt. | Ages. | Amt. | Ages. | Amt. |
|---|---|---|---|---|---|---|---|---|---|
| 21–28 | $0 75 | 27–38 | $1 00 | 41–50 | $1 20 | 51–55 | $1 50 | 56–60 | $2 00 |

An additional sum of 10 cents on each assessment was added to pay expense of collection. An annual assessment was also provided for at the following rates: Upon certificates limited to $1250, $1.50; limited to $2500, $2.25; limited to $5000, $3.

The by-laws of 1880 provided for the following maximum assessment rates, to pay death claims, according to age at joining and membership of the association, for each $625 of insurance:

| Age. | Amt. | Age. | Amt. | Age. | Amt. | Age. | Amt. | Age. | Amt. |
|---|---|---|---|---|---|---|---|---|---|
| 21–26 | $0 75 | 27–38 | $1 00 | 39–47 | $1 20 | 48–52 | $1 50 | 53–56 | $2 00 |

To which assessment, when necessary for the payment of general expenses and collection costs, the board of directors might add a sum not exceeding the following amounts per month: On certificates limited to $625, 15 cents; $1250, 18 cents; $2500, 24 cents; $5000, 30 cents.

The by-laws of 1886 provided for assessments to pay death claims and current expenses and collection costs at precisely the same rates as in the by-laws of 1880, given above, mortuary and expense assessment, however, to be collected at same time. It is expressly provided by these by-laws that there shall be six mortuary calls, and only six, each year, to be levied on same days as provided in revised by-laws of 1892, and in policy in suit.

The assessment rates provided in the by-laws of 1890 were such a percentage of the following as the mortality experience and the maintenance of the emergency fund might require, the rate being for each $625 of in-

surance, payable bi-monthly, same as in by-laws of 1892, and according to age at joining:

| Age. | Amt. | Age. | Amt. | Age. | Amt. | Age. | Amt. | Age. | Amt. |
|------|------|------|------|------|------|------|------|------|------|
| 21 | $0 80 | 23 | $0 82 | 25 | $0 84 | 27 | $0 88 | 29 | $0 92 |
| 22 | 81 | 24 | 83 | 26 | 86 | 28 | 90 | 30 | 94 |

To provide for agency and general expenses, each member could be charged 12½ cents per month on each $625 of insurance, to be collected with each bi-monthly call. The same provision for the accumulation, use and distribution of the emergency fund is found in these by-laws as in those of 1892. The revised by-laws of 1892 contain no reference to or mention of the former by-laws.

This is believed to be a sufficient statement of the material facts shown upon the trial to serve as a basis for the disposition of the questions presented upon this appeal. Such additional facts as may be deemed necessary to consider may be stated in connection with the discussion of the questions presented for decision.

*Opinion.*—The first and eighth assignments of error complain respectively of the general charge and the refusal of the court to give in charge to the jury a special instruction requested.

The portion of the general charge attacked is as follows: "If said Carden agreed with Dr. Smith to remit the advance premium or membership fee, and if afterwards, and before the delivery of the certificate, he claimed such fee from Dr. Smith, and if Dr. Smith, in compliance with such demand, gave Carden an order on defendant for $37.50, and afterwards accepted from defendant the certificate the application for which was procured by said Carden, and if the defendant paid said Carden said sum on said order, then the defendant had the right to pay such order, notwithstanding the fact (if it was a fact) that Dr. Smith requested the defendant, after having given the order, to pay the money to him instead of Carden, and if you find such to be the facts in the case, you will find for the defendant."

This is the special charge asked: "That if you believe from the evidence that Carden had authority from the defendant to rebate the membership fee, and that he entered into a contract with the deceased for the deceased to take a policy of insurance for $5000 in the defendant association, and that as a part of said contract said Carden agreed to relinquish and did relinquish to the deceased said membership fee, and in pursuance thereof deceased made application for said policy, and that defendant delivered said policy to deceased; and that afterwards defendant applied $37.50 of the debt which it then owed deceased for medical examinations to the payment of advance premium on said policy, and notified deceased of such application, and that if deceased, in exercise of ordinary care, was thereby led to believe and understand, and did so believe and under-

stand, that such application of said $37.50 by defendant was for the purpose of paying premiums on said policy to accrue after the time said policy would be carried by said relinquishment, and by reason of such belief and understanding deceased acquiesced in such application of said $37.50 by defendant, and if the defendant knew, or in the exercise of ordinary care ought to have known, that such was the belief and understanding upon the part of deceased, and that this was why he was acquiescing in the application of said $37.50, then you will find for plaintiff, unless you find against her on account of the other instructions given you."

The proposition urged against the charge of the court is, that the term "advance premium" should be held to mean money paid by the assured in advance for the purpose of meeting mortuary calls made after the expiration of the 105 days. It is insisted that, under the terms of the certificate and laws and regulations of the association, the term "advance premium" is of doubtful meaning, and that courts should give it that meaning which would be most beneficial to the assured, and prevent a forfeiture. In support of this position, authorities are cited to the effect that, where the terms of an insurance contract are of doubtful import, and will admit of different constructions, one of which will sustain the contract and prevent its forfeiture, while the other will result in forfeiture, courts should adopt the construction which will uphold the contract. 1 Bacon on Ben. Soc., sec. 203; Anson on Con., sec. 331; Goodwin v. Savings Assn., 66 N. W. Rep., 157; Bank v. Ins. Co., 95 U. S. 673.

The proposition of law announced is sustained by the authorities, and is well established; but the application here attempted to be made can not be admitted. We think it clearly appears that the "advance premium" provided for by the laws of the association is in the nature of a membership fee. Eight dollars per thousand insurance is charged against all applicants, regardless of their ages, while the amount of the assessments to be subsequently paid are rated, and differ according to ages. The "advance premium" carries the policy free of other charge for at least 105 days; that is, mortuary calls can only be made against the holder of a certificate after it has been in force 105 days, and these calls can only be made on the first business days of January, March, May, July, September, and November. The payment of the advance premium by the assured would have carried his insurance, without further payment, to the mortuary call of May 1, 1893, to which his policy was subject.

The special charge asked is based upon the idea that the assured may have been misled into the belief that the advance premium was remitted, and that the company had applied his $37.50 to the payment of assessments to be made after the period had passed through which the advance premium would carry the policy, and that the company knew or ought to have known that he so understood the matter, and therefore should be held responsible. The evidence did not warrant any such charge. What was meant by the advance premium was clearly manifest from the contract. The assured had explicit notice that his $37.50 had been paid

to Carden as the advance premium due from the assured, and was further notified at the time the policy was delivered to him that the first mortuary call which would be made upon him would occur on May 1, and would be for the sum of $9, and he was requested to carefully read the certificate and copy of application attached. The mortuary call was made May 1st, in accordance with this notice, and forwarded to and received by the assured. Under such a state of facts, there was no occasion for any such mistake as that contended for by appellants.

The tenth and twelfth assignments are directed respectively at the refusal of a special charge asked and the charge given.

The special charge is in this language: "That the written order given by Dr. Smith to Carden was subject to countermand, and if the payment of it was countermanded by deceased before defendant became liable thereon, then defendant had no right to pay the same to Carden without deceased's consent, or unless, deceased knowing that the same had been so paid by defendant, it was afterwards ratified by deceased."

The part of the general charge complained of is the seventh paragraph, as follows: "If Carden agreed with Dr. Smith to remit the advance premium or membership fee, and if afterwards, and before the delivery of the certificate, he claimed such fee from Dr. Smith, and if Dr. Smith in compliance with such demand gave Carden an order on defendant for $37.50, and afterwards accepted from defendant the certificate the application for which was procured by said Carden, and if defendant paid said sum to Carden on said order, then the defendant had the right to pay such order, notwithstanding the fact, if it was a fact, that Dr. Smith requested the defendant, after having given the order, to pay the money to him instead of Carden; and if you find such to be the facts, you will find for the defendant."

As has been heretofore shown, the advance premium or membership fee was expressly provided for by the laws of the association, and by the terms of a private contract between the soliciting agents and the association, it was to go as compensation to said agents. The agents had authority to relieve applicants of payment of this advance premium, if they desired to do so, but they were under no obligation to do it. It was simply a matter between the soliciting agents and the assured, whether the payment should be made. The company got the benefit of the advance premium in either event, for this constituted compensation to the agents, and if they remitted it to applicants for insurance the company was not affected thereby. Under these conditions, after Carden demanded of the assured payment of the advance premium, and the assured gave him an order on the company for $37.50 out of the amount due him by the company, in payment of such advance premium, he had no right to countermand this order, without countermanding his application for insurance at the same time. He had no right to demand the certificate of insurance without payment of the advance premium. It was a matter of grace on the part of the agent to relieve him of its payment, and if the agent withdrew his promise, claimed to have been made, to that effect, before the

sending in of the application for insurance, and in response to his demand for its payment assured gave the order for $37.50, he had no right afterwards to countermand the order and claim the benefit of the certificate of insurance without payment of the advance premium. We think the charge of the court correctly presented this phase of the case to the jury, and did not err in refusing the special charge.

Under the thirteenth and fourteenth assignments of error appellants assail these two sections of the charge:

"If you find that Carden claimed or demanded $37.50 of Dr. Smith, on the ground that he was entitled to a part of the medical examiner's fees, and if in fact Smith had contracted with Carden to divide his examination fees with him, and if Smith gave him the order in compliance with such claim, and afterwards countermanded the order and notified defendant not to pay it, then defendant had no right to pay it to Carden, and if you so find, then, unless you find that Dr. Smith had notice that the money had been so applied and acquiesced in the same, you will find for plaintiff. On the other hand, if you find that Dr. Smith and Carden had a controversy as to the $37.50, and Smith gave him the order and afterwards submitted the question as to Carden's right to the $37.50 to the defendant to decide, and if the defendant decided against Dr. Smith and paid it to Carden, and Smith had notice of such decision and acquiesced therein, until defendant had declared his certificate forfeited, then Dr. Smith had no right to have said money applied to payment of said mortuary call No. 120, although you may believe that originally he had a right to the money; and if you so find, you will return a verdict for the defendant.

"You are at liberty to determine from the letter from Dr. Smith to defendant, dated December 11, 1892, and from all other evidence before you which may bear upon the question, as to whether said letter was meant as a submission of the matter in dispute between Smith and Carden to the defendant for decision, and even if you find that Smith intended it as a positive countermand of the order, if the defendant mistook the meaning and believed in good faith that it was intended to submit the matter to it to investigate and decide, and paid the money to Carden under such mistaken belief, and if Dr. Smith knew or had notice of such decision and acquiesced in the same until after his certificate had been declared forfeited, then you must find for defendant."

Based upon these assignments appellants urge two propositions:

First.—They assert that unless the assured knew of the mistake in the interpretation of his letter by the association, his rights should not be prejudiced thereby. We do not think the court erred in the particular complained of. If the association in good faith applied the $37.50 due and owing by it to Dr. Smith upon the advance premium on his policy, and notified him of such application, and he acquiesced in it, receiving and retaining his policy, the assured could not, if his policy had become forfeited for nonpayment of the mortuary call, levied subsequent to this appropriation and notification to him, repudiate the application of the

money and insist that it be applied in discharge of mortuary calls, and thereby impose a liability of $5000 in favor of beneficiaries of his certificate. That is to say, even though the application of this $37.50 by the association to the payment of the advance premium upon the policy, the same going into the hands of George A. Carden, should be determined as not strictly equitable as between the assured and the soliciting agent George A. Carden, yet if the assured knew of the application and received and retained the policy with such knowledge, he should not have allowed the policy to become forfeited by nonpayment of subsequent assessments, and can not have this transaction opened up and the rights between him and Carden adjusted, and by such adjustment impose a heavy liability upon the association. If he intended to insist upon his claim, asserted in this case, that this $37.50 should be paid to him or applied to future assessments made against his certificate, he should have asserted and maintained this claim before the forfeiture, and declined to accept the benefits of the certificate under the conditions of its delivery to him by the company. 2 Pom. Eq. Jur., 817; Big. on Estop., 683; Hansen v. Supreme Lodge, 29 N. E. Rep., 1121; Eaton v. Supreme Lodge, 22 Cent. Law Jour., 560; Hopkins v. Phoenix, 43 N. W. Rep., 197; 78 Iowa, 344; Insurance Co. v. Hogarty, 36 N. Y. Sup., 558-562; 2 Whart. on Ev., secs. 1140, 1154; 1 Greenl., sec. 197, et seq.; 62 Am. Dec., 91, and note.

Second.—It is insisted that the evidence did not justify this issue being submitted to the jury. This contention is not borne out by the record. The issue had a legitimate basis in the evidence, and besides, appellants requested a charge based on ratification of the application by Dr. Smith, and having invited the court to charge upon this issue, they can not now complain that the court did so.

The contention that it was error in the court to leave to the jury the determination of the question whether the assured intended by the letter of December 11, 1892, to countermand the order given by him to Carden upon the company for $37.50 is not well taken. The letter did not, in express terms, countermand the payment of this order, and the court very properly left the jury to determine, under all the facts and circumstances of the case, whether the writer intended the letter to be a countermand of the order previously given to Carden. Taylor v. McNutt, 58 Texas, 75; Moss v. Helsey, 60 Texas, 438; Talliaferro v. Cundiff, 33 Texas, 416; 28 Am. and Eng. Encyc. of Law, p. 535.

The eighteenth assignment of error: "The court erred in charging the jury that the contract between deceased and defendant was contained in the certificate and written application therefor, when they should have been instructed to construe the same in connection with defendant's rules and by-laws."

The court, in its charge, stated to the jury the legal effect of the contract between the parties, and gave to the jury for determination only issues of fact arising in the evidence. While it is true that the rules and by-laws of the association constituted part of the contract of insurance, the court having fully stated the legal effect of the contract to the jury,

no harm was done to the appellants by the court's parenthetical statement that the certificate and application showed the contract between the parties.

Seventh assignment of error: "The court erred in charging the jury that the failure of Dr. Smith to pay or cause to be paid, or to advance money or means to defendant to pay, said call No. 120 caused a forfeiture of said certificate, because it was not shown by the evidence that the deceased was ever notified by defendant that the question of the cancellation of his certificate for failure to pay mortuary call 120 would come up for hearing and investigation before the board of managing directors of defendant, giving the time when same would come up as is provided in said certificate."

This assignment of error is based upon section 14 of the certificate, which reads: "If, at any time during the first five years of this contract, reliable information and evidence shall come to the knowledge of said association that the insured did make false and untrue statements in his or her application, on the good faith of which this certificate is issued, or if the insured shall be guilty of any criminal act, or shall injure his or her health by the use of alcoholic, narcotic, or other stimulants, or shall become an habitual or excessive user of intoxicants, have delirium tremens, or shall violate any one of the conditions or agreements contained in the application or this certificate, the association may, by written or printed notice signed by its president and secretary, notify the insured of his or her violation of the conditions and agreements therein contained, and that the question of cancellation of the same will come before the board of managing directors at the time named in said notice (which shall not be less than thirty days from date thereof) for hearing and investigation, and the finding of the said board and their action thereon shall be final and conclusive and an absolute bar to the prosecution and recovery on this certificate after the death of the insured."

Section 2 of the certificate provides: "No personal liability of the insured is incurred by becoming a policy holder in this association; but this certificate of insurance is issued and accepted subject to the express conditions that if any of the payments stipulated in this contract shall not be paid to the association on or before the days of the dates as provided in this contract, at its home office in Galesburg, Ill., this contract shall terminate, and all rights be forfeited to this association."

The general language in section 14, above quoted, "or shall violate any agreements of this certificate," must be construed so as to refer to conditions and agreements of the nature and kind particularly enumerated in the preceding part of this section. This is in accordance with the general rules of construction that the particular controls the general. Railway v. Rambolt, 67 Texas, 656; Perez v. Perez, 59 Texas, 322-324. That this construction reaches the true meaning and intent is rendered manifest and certain by the language of section 2 above quoted, which makes the failure to meet payments stipulated for in the contract work an absolute forfeiture of the policy.

In the second and sixth assignments of error it is urged, first, that there being no unpaid claims against the association at the time call No. 120 was levied, no mortuary assessments could be made. There is a provision in the policy to this effect: "To provide for the payment of all death claims, or other current expenses, and to maintain an adequate emergency or reserve fund to guarantee the prompt payment in full of all future obligations, three shall be due, according to the mortality experience and emergency fund requirements of the association, and payable at its general office in Galesburg, Ill., on the first business days of January, March, May, July, September, and November, respectively, of each and every year during the continuance of this contract, a bi-monthly premium or assessment based upon the annexed tables of rates, according to age, and graded according to the mortality experience of the association and amounts of benefits named herein."

It was shown that mortuary call No. 120 was paid out of funds on hand raised by previous assessments under mortuary calls, and that call No. 120 was made to replenish this fund. It was shown that this was a practice and method of business adopted and carried on by this association. A fair construction of the provisions of the contract, including the by-laws, rules, and regulations of the association, leads to the conclusion that this method of business was authorized. Niblack, p. 481; McGowan v. Supreme Council, 28 N. Y. Sup., 177; Wolf v. Michigan, 66 N. W. Rep., 576; 3 Am. and Eng. Encyc. of Law, 2d ed., 1093, et seq.

It is further urged that this call was void, because it was based upon a large number of claims which should have been included in call issued on March 1st preceding. It is sufficient to say, in answer to this proposition, that no greater sum was demanded of the assured than he had contracted to pay as his bi-monthly assessment. He was liable under the terms of his policy for the assessment made on May 1, 1893, and as the company had authority to make this assessment with a view of replenishing the mortuary fund, exhausted by the death claims which were the basis of this mortuary call, there is nothing that he can justly complain of.

The appellants further urge that call No. 120 was void because a greater sum was demanded of the assured than was due according to his contract, as set forth in the by-laws. The contention is that there were members of the association who became such before March, 1890, and that they were assessed at a less rate than was the assured. The association has had several sets of by-laws, with policies issued under each, and while all policy holders were assessed by call No. 120, each policy holder was assessed at the rates provided in the by-laws under which his policy was issued. The assured made application and received his certificate under the by-laws of 1892. These laws fixed his rate of assessment definitely, and by his contract he obligated himself to pay bi-monthly the sum of $9. His policy or certificate possessed benefits that the old certificate holders were not entitled to. He voluntarily went into the organization under these by-laws, with the positive obligation to pay this amount of assess-

ment bi-monthly. He is in no attitude to complain that old policy holders, whose certificates were issued under different by-laws and under different rates, are charged less than himself. Niblack, 273, 475; Cohen v. Ins. Co., 63 N. W. Rep., 304; Leffingwell v. Ins. Co., 53 N. W. Rep., 243; Wiler v. Ins. Co., 36 N. Y., 734.

Under the fourth and fifth assignments of error, this proposition is presented: Mortuary call No. 120 is claimed to be illegal and void because the object or objects for which the money was to be collected were not legal objects, and were not sufficiently stated. These mortuary calls are required by the terms of the policy to comply with the statutes of Illinois. The Illinois statute on the subject of notice is as follows: "Assessment Notices—Application of Funds.—Assessment notices sent to members by any association or corporation doing business in this State shall state the object or objects for which the money to be collected is intended; the names, last address, and amount of certificates of deceased members, the amount to which the beneficiary of each is entitled, or the amount which would be realized for the beneficiaries of each if all the members who are assessed would pay their assessments, and no part of the funds collected for the payment of death benefits shall be applied for any other purposes."

The notice under consideration states that it is made in consequence of the death of seventy-two members of the association, whose names, addresses, and the numbers of whose claims are carefully stated in the notices. The notice states it is mortuary call No. 120. The contract and by-laws of the association define what is a mortuary call, and what it includes. We think the notice was a full and fair compliance with the statute. Niblack, p. 481; McGowan v. Ins. Co., 28 N. Y. Sup., 177.

The eleventh assignment of error complains of the refusal of this special charge: "If, after Dr. Smith had earned the $37.50 in services rendered defendant, and had also contracted in good faith with an authorized agent (Carden) to take a policy, the membership fee to be rebated, and then Carden undertook to defraud Dr. Smith out of said $37.50, and if the defendant, knowing of such fraud on Carden's part, joined therein and became a party thereto, for the purpose of preventing Dr. Smith from collecting said debt, and to enable Carden to collect same, where he had no right to do so, and then paid same to Carden, but withheld from deceased the knowledge that he had done so, and led him to believe that the same had been applied to the payment of premiums which were to accrue and mature on his policy in the future by use of the unexplained term 'advance premium,' then the forfeiture of policy for nonpayment of mortuary call No. 120 was void."

The court did not err in refusing this special charge, for the reason that the evidence did not warrant the presentation of such an issue to the jury.

We find no error in the judgment. It is therefore affirmed.

*Affirmed.*

Writ of error refused.